# EXHIBIT A

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
                      SOUTHERN DISTRICT
```

```
- - - - - - - - - - - - - - - x
                              :
U.S. EQUAL EMPLOYMENT         :
OPPORTUNITY COMMISSION,       :
                              :
         Plaintiff,           :    Case No. 17-02881-TDC
                              :
      v.                      :
                              :
MVM, INC.,                    :
                              :
         Defendant.           :    Greenbelt, Maryland
                              :
- - - - - - - - - - - - - - - x    February 25, 2020
```

**TELEPHONE CONFERENCE**

        BEFORE:  THE HONORABLE GINA L. SIMMS, Judge

APPEARANCES:                    MARIA SALACUSE, ESQ.
                                DAVID JOHN STAUDT, ESQ.
                                U.S. Equal Employment Opportunity
                                Commission
                                G.H. Fallon Federal Building
                                31 Hopkins Plaza
                                Suite 1432
                                Baltimore, MD 21201
                                   On Behalf of the Plaintiff

                                ALISON N. DAVIS, ESQ.
                                KIMBERLY DUPLECHAIN, ESQ.
                                Littler Mendelson PC
                                815 Connecticut Avenue, N.W.
                                Suite 400
                                Washington, DC 20006
                                   On Behalf of the Defendant

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.

1    office. It is clear that he looked at the video of the

2    hallway to the annex office as I said earlier for the period

3    of February 17th and February 19th.

4          Now with respect to McHale and the card readers,

5    with respect to card reader number 1, as I said, the summary

6    memorandum doesn't mention card reader number 1.  He denies

7    reviewing card reader data and he says that he believes that

8    McKinney was the one who reviewed the data.  With respect to

9    card reader number 2, McHale says he never reviewed any card

10   reader data concerning go because  his understanding was that

11   he saw the video, it was video camera 3 and it shows Gough

12   going in or out, there is only one way in or out and he of

13   course never viewed the video card reader for card reader

14   number 2.

15         Now, with respect to Hines as I said earlier, it is

16   clear she testified in her deposition that she reviewed the

17   video tape that captures video angle 1 and as I said, there

18   is no evidence before with respect to video angle 2 that this

19   was viewed by her back in 2016.  If you look at Exhibit 50 to

20   the reply brief page 124, she says that when she looked at

21   the 2/18/2016 footage she doesn't recall fully which camera

22   it came from.  But as I will elaborate on earlier, I don't

23   think that anyone really thought about video camera 2 or

24   video angle 2 until 2019.

25         With respect to Ms. Hines and the card reader, as I

1  said she was not asked about card reader number 1 in her

2  deposition.  She was asked about card reader number 2.  If

3  you look at ECF number 100, Exhibit 9 page 82, that

4  solidifies that and she said she didn't -- she testified that

5  she did not recall whether she was ever asked to pull certain

6  card reader data.

7          So, in sum, I do not find in front of me any

8  evidence that anyone reviewed any video from video camera 2,

9  video angle 2 back in 2016.  And so there is no evidence to

10  me that is compelling that frankly such a camera was working

11  on February 18th, 2016, let alone what it actually captured

12  as opposed to what it could have captured or might have

13  captured.

14          There is no evidence before me that anyone ever

15  reviewed any evidence from card reader number 2 and I don't

16  have any evidence that card reader 2 was actually functioning

17  on 2018, let alone what it actually captured in the hopes of

18  what it could have or should have captured.  Now, with

19  respect to access to video tapes and card reader data, I find

20  that MVM had access to video surveillance via social security

21  command center and via the Lenel software.

22          This does not mean that MVM had the right to

23  download footage from video cameras on to their laptops and

24  preserve them. Hines testified that most clearly on this

25  subject and she said there was a capability to export the

1          All right, next I find that on December 14th, 2016,

2     MVM position statement to the EEOC says, and it is listing

3     different people and it says their names and it says that

4     people including the SSA folks, SSA person and plaintiff's

5     representatives, Ms. Scott, Mr. Simms and talking about

6     everybody viewing the SSA videotape of entrance 21.

7          And we continue reviewing the position statements,

8     it says -- and this part is not entirely clear but there is

9     just reference to how Mr. McHale and Mr. McKinney again ask

10    to view the video footage later but then it mentions you

11    know, annex, the annex office and it says that the video

12    footage confirms that upon Wilson's arrival -- my point being

13    is that it is not clear to the reader of the position

14    statement that there is more than one video tape.

15          I also do not find it clear from that position

16    statement that there is card reader data that was reviewed.

17    Now, I do find that on April 19th, 2017, there is an e-mail

18    from MVM to the EEOC investigator Mr. Collins and part of

19    that e-mail includes where MVM tells the EEOC, I will

20    reiterate that there is an government employee, Nancy Hines

21    who has reviewed the video and she corroborated and sort of

22    other facts, statements along those lines.

23          Now from the record before me, I conclude that

24    the surveillance videos and card reader data constitute

25    electronically stored information.  Regarding the type of

1  evidence before you, we admit that this type of evidence is

2  proportedly available all that belongs to SSA.  It was not

3  MVM's property.

4          There is no evidence before me that MVM ever asked

5  the Social Security Administration to preserve card reader

6  data information or any video tape at any time before this

7  litigation commenced.  The SSA says that the original

8  surveillance video is -- was available back in 2016 or

9  housed, if you will, or viewable through a system called

10 Lenel, L-e-n-e-l, for a period of 30 days.

11         SSA also says that it had the capability to pull

12 and review card reader history either from the reader

13 themselves or via Renel -- via the Lenel system if in fact it

14 had been asked back in 2016.  The Social Security

15 Administration does not know however how long this card

16 reader data information was available in the actual readers

17 or in the Lenel system.

18         There is some reference to SSA having been able to

19 retrieve the data perhaps for as long as 2 to 3 months after

20 the fact and that was in the context of some other unrelated

21 occasion that that testimony came up.  I next find that the

22 first time that the EEOC asked the Social Security

23 Administration about the existence of any video evidence in

24 its possession was in October 2018.

25         The first time that the EEOC asked the Social

1    seems like it is in the fall of 2018.  If you look at pages

2    152 through 154 of her transcript.  So as I said, it is not

3    exactly entirely clear how this excerpt was created.  We

4    don't know precisely because there is confusing testimony I

5    find about where it exactly came from, which tapes or tapes

6    were used to create it that was kind of left hanging out

7    there.

8             What I do note from the EEOC after my January 28th

9    hearing is that there is a declaration from the Social

10   Security Administration in which now in 2020 saying that it

11   is not able to confirm the date and times the video at issue

12   because it can't now put back into the system because the

13   video was not being time stamped at the time of exporting.

14            But as I said, you know, it is just not quite clear

15   to me why SSA -- when SSA was asked by the EOC to create that

16   excerpt, you know, it is not clear what kind of chain of

17   custody request was made, why someone didn't think of these

18   issues.  But in any event, it is just not on the record

19   before me.  And it is puzzling and troubling to me.

20            All right, so there is no evidence before me I find

21   that the EEOC during its investigation before it filed this

22   law suit ever attempted to look at any SSA video or card

23   reader data despite being told about it in December of 2016.

24   Indeed during my hearing, I asked EEOC whether any of its

25   investigators followed up with MVM after that December 2016

1    memorandum and I was sort of told no and as I said, I find it

2    troubling that an investigator did not follow up and say well

3    gee, well what is this video they are talking about?  What do

4    you mean that there is a video?  What do you mean that there

5    is somebody in -- from the SSA who also viewed it -- I find

6    that troubling.

7             Now, all right, so now those are my factual

8    findings and so before I make my rulings, let's talk about

9    the law.  Spoliation is the destruction of material -- is the

10   destruction or material alteration of evidence in a pending

11   litigation or reasonably foreseeable litigation.  That comes

12   from Goodman versus Praxair, P-r-a-x-a-i-r, Services Inc.,

13   632 F. Sup 2nd 494 jump site 505, that is in the District of

14   Maryland 2009 and Judge --- Goodman is quoting the case of

15   Thompson versus U.S. Department of Housing and Urban

16   Development, 219 FRD 93, jump site 100 out of the District of

17   Maryland.

18            Now it is also established in this district and in

19   this circuit that generally sanctions for spoliation are

20   governed by three factors generally, that are set forth in

21   Thompson, the case that I have eluded to.  And if you look at

22   page 101 of the Thompson opinion, it is that the party having

23   control over the evidence have the obligation to preserve it,

24   when it was destroyed or altered.  Two, that the destruction

25   or loss was accompanied by a culpable state of mind and

1        So ultimately I need to answer the question of

2   whether if back in March 2016, well before this instant

3   litigation arose, MVM was required to notify its interested

4   third party that it had a duty to preserve those three forms

5   of potential evidence video camera 1, video camera 3 and card

6   reader 1.

7        So if I step back for a minute, there is also a

8   question about what the duty to preserve entails, what must

9   be done specifically to preserve "potentially relevant

10  evidence" that is from <u>Victor</u> <u>Stanley</u> page 523.  From <u>Victor</u>

11  <u>Stanley</u> and from the <u>Goodman</u> case, and the common law, there

12  is this idea that the parties "must preserve relevant

13  evidence under their control".  That is from <u>Victor</u> <u>Stanley</u>

14  at page 523, from <u>Goodman</u> at page 515.

15       And in <u>Goodman</u>, Judge Paul Grimm analyzed the case

16  called <u>In</u> <u>Re:</u> <u>NTL</u> <u>Incorporated</u> <u>Security</u> <u>Litigation</u>, 244 FRD

17  172 from the Southern District of New York in 2007.  And

18  Judge Grimm analyzed that to get an idea -- to get at what

19  the motion of what control means.  "An item under a parties

20  control when the party has the right, authority, or practical

21  ability to obtain the documents from a non-party to the

22  action."  <u>In</u> <u>Re:</u> <u>NTL</u> 244 FRD at 195.

23       But looking carefully at <u>Goodman</u>, if you look at

24  footnote 11, there is a lengthy discussion about something

25  called the practical ability test.  And when you look at

1    footnote 11, it summarizes case law from Maryland, from the

2    7th Circuit from other courts in the 4th Circuit, the 2nd

3    Circuit and I think Arizona, there's some other circuits --

4    California, Kansas.  And when you look at all of those cases,

5    there is a mention how at the time that Goodman was decided

6    and Goodman was decided in 2009, the contours of what this

7    practical abilities meant would still -- was still evolving.

8            I do note that the Court in Goodman did not adopt a

9    practical abilities test.  If you look at footnote 11, you

10   make the -- the Court makes that abundantly clear.  He says

11   he found it more useful to assess a party's obligations under

12   Rule 34 when you are thinking about practical abilities but

13   he didn't find the practical abilities test to be the

14   compelling test in the context of the spoliation case.

15           So in looking at practical abilities, it is

16   relevant for a Rule 34 analysis but not so much in the

17   context of spoliation.  So --- in Goodman, Judge Grimm

18   adopted the control test that comes from In Re: NTL Security

19   Litigation.  Finding "more useful in determining the control

20   required that is consistent with Sylvestri to trigger a

21   party's duty to preserve evidence."  That is Goodman 623 F.

22   Sup 2nd at 516 and as I said, footnote 11.

23           Now, in the In Re: NTL Security Litigation case,

24   there were cross plaintiffs who filed suit against NTL

25   Incorporated.  NTL Incorporated thereafter entered into

1    bankruptcy and two companies emerged from that bankruptcy.

2    NTL Europe and NTL Incorporated.  NTL Europe claimed that it

3    couldn't be responsible for evidence, it was spoliated in

4    that case.  Because it didn't have control over any documents

5    at issue.

6              It claimed that they were in possession of the new

7    NTL entity.  The Court in that <u>NTL</u> case disagreed finding

8    that NTL Europe had both the legal right and the practical

9    ability to obtain any documents in possession of "new NTL".

10   In that particular case, there was a document sharing

11   agreement and there was testimony from an NTL Europe

12   representative that he could simply ask a new NTL for

13   documents and it would get them.

14             So for control there was an examination in that

15   case of both the legal right and the practical ability.  And

16   there was a duty to preserve the understandably extent the

17   two entities that were so closely intertwined, they were

18   related structures who emerged for a bankruptcy.  So in

19   <u>Goodman</u> then, the control test that comes from <u>In Re: NCL</u> was

20   used, legal right and practicability and the Court determined

21   in <u>Goodman</u> that there was no evidence that this defendant in

22   that case, he was called Tracer, had any legal control over

23   documents they obtained by a third party.

24             The Court also found that there were insufficient

25   facts on that -- before it, that demonstrated a cooperative

1    the legal right to obtain a copy of a material issue.  There

2    is no contractual right to this evidence and MVM is not an

3    agent of the Social Security Administration.  The fact that

4    MVM was under contract to provide security at an SSA facility

5    does not convert SSA into an interested non-party, nor does

6    it mean that  MVM automatically had an obligation to notify

7    the Social Security Administration to preserve this

8    information.

9         Compare the case of <u>Woods</u> <u>versus</u> <u>Scissons</u>,

10   S-c-i-s-s-o-n-s, civil number 17-08038, 2019 West Law 3816727

11   out of the District of Arizona, in that case there was a

12   discussion about third parties who had a contractual

13   relationship or had a duty to indemnify in light of the

14   litigation.  They were not disinterested non-parties.  I

15   contract them with the Social Security Administration who is

16   not a party to this action and is not an interested party.

17   It is not an interested non-party either.

18        Ms. Hines, the relevant SSA official made clear

19   that a FOIA request was necessary for MVM to obtain copies.

20   I also do not find based on the record before me that MVM has

21   the ability to express the data.  And as I said to the

22   contrary, Mr. Falcone had the ability and there is no

23   evidence before me that Falcone was asked to export that data

24   for MVM.  The record is murky at best as to whether MVM ever

25   exported videos --- to the laptop but I actually don't think

1    that it did.

2         The record is clear however, that MVM had the

3    practical ability to obtain information from SSA.  Indeed MVM

4    asked SSA for access to video camera 1 footage and was given

5    that access many times. MVM had read on the access but seemed

6    to be given that access freely.  MVM also asked SSA for

7    access to video camera 3 footage and was given such access.

8    And again it is not clear on this record who accessed the

9    information from card reader 1 about Ms. Wilson.

10        And as I said earlier, there is no concrete

11   evidence before me that any one looked at video camera 2

12   video angle 2 and card reader 2 before the 2018 or 2019.  So

13   where or how do I rule on this control test?  I have to say

14   it is a close call.  I have to say it is a close call because

15   there was this collaborative, cooperative relationship that

16   existed between SSA and MVM back in 2016.

17        So while I don't find that MVM has a legal right to

18   this material, I think it did have a practical ability to get

19   it.  It strikes me as unfair and troublesome that MVM could

20   have asked SSA to preserve the three pieces of evidence,

21   video camera 1, video camera 3 and card reader 1 as I said

22   earlier, by no later than March 21, 2016.  But MVM did not do

23   so.

24        It is troublesome to me because where it is here,

25   two forms of the --- video evidence are gone and card reader

1   evidence is gone -- card reader number 1 evidence is gone and

2   MVM would like to rely on a memorandum and testimony of

3   people who viewed one or more of those things.

4          You know, when you look at Federal Rule of Civil

5   Procedure Rule 37(e), it talks about whether a party failed

6   to take reasonable steps to preserve the ESI.  That is

7   element 2.  That is also consistent with the Ethicon case.  I

8   do not find that it was unreasonable for MVM to have asked

9   SSA to preserve as I said, the three pieces of information.

10          MVM should have notified SSA.  It would have been

11  reasonable for MVM to have done this.  However, I do not

12  believe that MVM was required to notify the SSA.  And I said

13  this because to date, I have not found a case that would

14  support the argument that MVA had a duty to notify, i.e. was

15  required to notify the SSA, this disinterested third party

16  that it must preserve the three forms of evidence back in

17  March 2016.

18          Irrespective frankly, of how I rule on control

19  issue, I think the case law in this circuit provides that a

20  party has a duty to notify the opposing party of evidence in

21  a possession of a third party.  That is Victor Stanley at

22  page 523.  Victor Stanley cites to Sylvestri at page 590.

23  This failure to notify also supports the imposition of

24  spoliation sanctions.  So a failure to notify an opposing

25  party clearly supports the imposition of sanctions.

1          But back in 2016, i.e. specifically in March, EEOC

2     was not yet an adverse party or an imposing party.  Now I

3     have looked at the 2019 Sedona Conference Commentary and

4     Legal Holes 2nd addition.  The trigger and the process.  20

5     Sedona Conference J, 341 specifically pages 385 to 387 and

6     particularly footnote number 78.  That is from 2019.

7          And it does not say that a party has a duty to give

8     notice to a third party or a non-party. That is has to

9     preserve evidence in this control that may be relevant to

10    future litigations.  There is the language that the party

11    should consider providing appropriate notice concerning the

12    needs to preserve materials or likely to be discoverable.

13          The same guidance exists in the Sedona Conference

14    Principles, best practices, recommendations and principles

15    for --- documents, 19 Sedona Conference J, page 1, jump site

16    107 to 108 and that is from 2018.  So -- but I do find that

17    by on or about June 29, 2016, I would think that MVM was

18    required to notify SSA to preserve the evidence.

19          I say this because by this date, MVM is told about

20    Ms. --- and I am looking specifically at -- and it says the

21    "EEOC form 131 that was given to Mr. Kevin Marquez, the

22    president and CEO on or about after June 29th."  I don't know

23    how many days he took to --- but it is on or around that

24    date.  When you look at the back side of that form and indeed

25    I checked the website to see whether this form was still in

1   The statement said as I said and before it is not really

2   clear about asking you to review video footage and talking

3   about the annex office and the video footage confirmed

4   Wilson's arrival and as I said it is not clear to the reader

5   of the his memorandum that there is more than one video tape.

6         However, I don't agree with the EEOC that MVM had

7   to use specific language like the SSA videos are not in our

8   possession or have to go to the SSA to get it or we have the

9   practical ability to get it.  I think it was enough to have

10  notified the EEOC that video surveillance existed.  And my

11  conclusion is supported by the fact that in April 2017 MVM

12  tells the EEOC investigator, hey someone from the SSA also

13  saw the video and had knowledge.

14        And I said there is no evidence before me that the

15  EEOC followed up on this information in 2017 and most of

16  2018.  I don't find that MVM was hiding the existence of the

17  video from the EEOC.  Regarding the card readers however, I

18  don't find that MVM provided adequate notice of the card

19  reader data at all, at any point during this litigation.

20        The reality is that I can --- probably according to

21  Hines, it was likely too late to get any card reader data.

22  It is likely too late to get any data from video camera 3

23  also.  And I guess I am supposed to refer to it is too late

24  to get footage from video camera 2, video angle 2 and video

25  camera 1, video angle 1, although that said it is just not

1   clear to me where this video excerpt really comes from when

2   it is generated in 2018, 2019.

3         What I do infer from the record however, is that

4   the SSA was not asked to take care when it exported whenever

5   it did to make this excerpt.  I don't find that to be MVM's

6   fault.  So where does that leave this case under Federal

7   Rule, an analysis I do under Rule 37(e)?  One, there must

8   have been a duty to preserve the ESI, I find there was.  But

9   the duty to notify the third party owner or the possessor of

10  the ESI did not arise until June 29, 2016.

11        Two, for the reasons I stated earlier, the evidence

12  was not in the actual possession or control of MVM. Yes, MVM

13  had the practical ability to obtain the material but it did

14  not have the legal rights to do so.  Three, regardless of

15  whether it actually had the control in this case and under

16  these facts I find that the mandatory duty to notify only

17  attaches to opposing parties.  That is what the case law

18  makes clear.  Not the third parties and I find that it does

19  as of the June 29, 2016 date.

20        I do not find it reasonable for MVM to have taken

21  reasonable steps to preserve the ESI until June 29, 2016.

22  As I said earlier, I do not fault MVM for not notifying SSA

23  about card reader 2 or video camera 2, video angle 2 because

24  as I said, I don't think anybody even thought about that

25  until Ms. Hines was finally deposed.  And as I said, as in

1    general --- are all you got, I just don't believe what it

2    made people think and look and ask, because it is clear to me

3    that the EEOC didn't ask about anything, not until

4    Ms. Salacuse or someone was involved in 2018/2019.

5            There were however, three complete pieces of

6    evidence that was lost that comes from video camera 1, card

7    reader 1 and video camera 3.  They are lost because of the

8    failure to take reasonable steps to preserve them.  That is

9    element 3 under Rule 37(e), that was Ethicon(sic).  And it

10   does not look like this information is discoverable through

11   additional discovery and that is element 4 of Rule 37(e) and

12   that is consistent with Ethicon.

13           So as a practical matter, this three pieces of ESI

14   likely were lost before MVM had the requirement to notify SSA

15   to preserve them.  That is not the EEOC's fault but it is

16   still a factor.  And it doesn't form to some extent my

17   analysis of the type of sanction to oppose against MVM.

18   Because as I said, they had a duty I think that was triggered

19   on or about June 29, 2016.  They never notified anybody about

20   the -- EEOC about the card readers and card reader data.

21           And they did not notify the EEOC about videos,

22   plural.  Now the case law makes clear that in order to impose

23   a sanction there must be some degree of fault.  That is

24   Sylvestri at page 590.  And the case law talks about sort of

25   the penalties that attach vary depending upon the degree of

1    the level of culpability present for the intent to defy --

2    deprive.  And MVM did not hide the evidence it relied upon.

3    It did not conceal it, it said there is a video.  Now, MVM

4    did not say hey that video evidence no longer exists or it

5    didn't make any other false representations about the video.

6           In sum, I reviewed all of the cases about you know,

7    willfulness, about the intent to deprive, I just don't find

8    those facts that the facts here support that.  And about ---

9    I don't have the evidence of willful destruction more of

10   intent to deprive.  I certainly do not find that there was

11   destruction for the purpose of depriving plaintiff of the

12   evidence.

13          So I find no basis for allowing EEOC to submit the

14   intent to deprive issue under Rule 37(e)(2) to the jury.

15   Now, more do I find the basis for instructing that it may or

16   must presume that --- all of the lost evidence was

17   unfavorable to the defendant.  Nor am I recommending that

18   EEOC be allowed to argue what the lost video camera 2 and

19   card reader 2 evidence would have or must have shown.  I find

20   that to be way to speculative here.

21          Regarding Rule 37(e)(1) in --- it is clear that if

22   the video and card reader evidence still existed and all they

23   proport to show what EEOC claims they do show or do not show,

24   then of course it would certainly make the plaintiff's work

25   easier, number one.  Number two, it is also clear to the

1   evidence that is relevant and material to this case.  So

2   there is prejudice to the EEOC.

3            But I cannot ignore as I said the EEOC didn't ask

4   about the videos during 2017 and 2018 and if there was an

5   ability to -- and I can't ignore that there was an

6   ability --- in 2018.  So in words, you know, it implied

7   thinking that everything was gone two to three months -- if

8   you are talking about the card reader, 30 days or more if you

9   are talking about Lenel, that can't be true with respect to

10  the video footage because we know something was created in

11  some fashion in 2018, 2019.

12           That is how we end up with the excerpt.  And as I

13  said when the EEOC asks for this excerpt, the Government

14  cured(sic) a basic chain of custody consideration to follow.

15  So there is no date and time stamp.  But that part doesn't

16  appear to be an error of MVM's making.  So there is now a

17  legitimate question about the authentic nature of this video

18  excerpt.

19           And plaintiff should not suffer a risk that this

20  excerpt will be deemed authentic by the jury in light of the

21  defendant's failure as I said to do something back in June of

22  2016.  So EEOC is asking for sanctions of the evidence which

23  I think based on the facts before me, I don't even think they

24  are admissible under the Federal Rules of Evidence.  EEOC is

25  asking of course because MVM seems to believe that this

lnc                                                                          55

<u>C E R T I F I C A T E</u>

      I certify that the foregoing is correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.

<u>/s/ Lisa N. Contreras   March 4, 2020</u>
Lisa N. Contreras              Date
Certified Transcriber
Certificate No.:  CET**D-474